654 A.2d 449

William A. FOGLE et al.

v.

**H & G RESTAURANT, INC. et al.**

No. 69, Sept. Term, 1994.

Court of Appeals of Maryland.

Feb. 24, 1995.

Rehearing Denied March 27, 1995.

442

444

Evelyn O. Cannon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Andrew H. Baida, Elaine Patrick, Asst. Attys. Gen., all on brief), Baltimore, for petitioners.

George A. Nilson (Henry R. Lord, Lynette M. Phillips, Joan E. Quigley, Piper & Marbury, Baltimore, Broughton M. Earnest, Piper & Marbury, Easton, Patrick R. Tyson, David L. Smith, Constangy, Brooks and Smith, Atlanta, GA, John G. Billmyre, Henry & Price, of Easton, on brief), for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case concerns the propriety of granting an interlocutory injunction delaying the implementation throughout this State of § 09.12.23 of the Code of Maryland Regulations (COMAR) captioned: "Prohibition on Smoking in an Enclosed Workplace."

## I.

The subject regulation was promulgated by the Commissioner of the Division of Labor and Industry (the Division) for the purpose of protecting Maryland employees from the haz-

ards associated with environmental tobacco smoke (ETS). It was developed with reliance on scientific studies that establish ETS as a cause of lung cancer and coronary heart disease in non-smoking adults as well as those that cite the workplace as being a significant source of exposure to ETS.

The regulation was promulgated under the authority of the Maryland Occupational Safety and Health Act (the MOSH Act), Maryland Code (1957, 1991 Repl.Vol.), §§ 5–101 *et seq.* of the Labor and Employment Article,[1] and the federal Occupational Safety and Health Act of 1970 (the OSH Act), 29 U.S.C. §§ 651 *et seq.*[2] Maryland's occupational safety and health program is both funded and overseen by the federal OSH Act. The OSH Act requires the Maryland Commissioner of Labor and Industry (the Commissioner) to adopt occupational safety and health standards that are "at least as effective" as those set forth by the federal Occupational Safety and Health Administration (OSHA). § 5–309(a)(1). Compliance with the federal guidelines in the OSH Act is a prerequisite to continued federal approval and funding of Maryland's state plan. 29 U.S.C. § 667(f) and (g).[3]

The Commissioner is responsible for carrying out the statutory mandate of the MOSH Act, which includes developing and adopting occupational safety and health standards designed to ensure that Maryland employees labor in safe and healthful working conditions. § 5–102(b). An "occupational safety and health standard" is a regulation that requires "the adoption or use of a means, method, operation, practice, or process that is reasonably appropriate or necessary to make employment and places of employment safe and healthful." § 5–101(e)(2).

---

1. Unless otherwise indicated, all references to the Maryland Code are to the Labor and Employment Article.

2. The MOSH Act, enacted in 1973, was patterned after the federal OSH Act of 1970 and many of the provisions in the two acts are substantially the same.

3. Approved state plans receive up to 50% of their funds from the federal government under the OSH Act. 29 U.S.C. § 672(g).

According to the MOSH Act, "[t]he [Maryland Occupational Safety and Health Advisory] Board shall . . . recommend to the Commissioner reasonable regulations: (1) to prevent conditions that are detrimental to safety and health in each employment or place of employment in the State; and (2) that the Board finds necessary to protect and to improve the safety and health of employees." § 5–308. The MOSH Act also, at a minimum, requires that in making occupational safety and health standards, the Commissioner promulgate regulations "that most adequately ensure, to the extent feasible on the basis of the best available evidence, that no employee, including an employee who has regular exposure to [the toxic substance] during the working life of the employee, will suffer material impairment of health or functional capacity." § 5–309(c)(1).

COMAR 09.12.23 is an occupational safety and health standard that requires all Maryland employers to ensure that there is no smoking permitted in any enclosed workplace and that there are "no smoking" signs posted at each entrance to a place of employment having such an enclosed workplace.[4] COMAR 09.12.23.03. According to the regulation, an "enclosed workplace" means an indoor place of employment. The definition includes, but is not limited to: all indoor work areas, vehicles used in the course of employment that are occupied by more than one employee, employee lounges or restrooms, conference and meeting rooms, classrooms, employer operated cafeterias for use of its employees, hallways, restaurants, bars and taverns, and sleeping rooms in hotels or motels. COMAR 09.12.23.01.

An important exception to this ban on smoking in all enclosed workplaces is that employers may permit smoking in "designated smoking rooms" as long as such facilities comply with specific structural and ventilation requirements. These designated smoking rooms may not be a location where an

---

4. The MOSH Act defines an "employer" as "a person who is engaged in commerce, industry, trade, or other business in the State and employs at least 1 employee in that business." § 5–101(d).

employee, other than a custodial or maintenance employee, is required to work. COMAR 09.12.23.04. Certain workplaces are completely exempted from the regulation. Those workplaces include tobacconist establishments (places that engage primarily in the sale of tobacco and tobacco-related accessories) and analytical or educational laboratories where smoking is necessary to the conduct of scientific research into the health effects of tobacco smoke. COMAR 09.12.23.02. Repeated or willful violations of COMAR 09.12.23 are punishable by fines of up to $70,000.00 per incident and all other deviations from the regulation's mandate are punishable by fines of up to $7,000 per incident. § 5–810(a).

## II.

On November 3, 1993, the Maryland Department of Licensing and Regulation asked the Maryland Occupational Safety and Health Advisory Board (the Board) to consider whether it would be appropriate to promulgate regulations concerning smoking in the workplace. The Secretary of the Department submitted a draft proposal to the Board. The Board voted to act on the Department's request and scheduled two public hearings in December, 1993. During these hearings, approximately 70 witnesses testified before the Board. The witnesses represented a multitude of different opinions and backgrounds. They included: Dr. Louis Sullivan, a former Secretary of the United States Department of Health and Human Services; Nelson Sabatini, the Secretary of the Maryland Department of Health and Mental Hygiene; legislators; scientists; physicians who have addressed various areas relating to ETS; representatives of the Tobacco Institute, a trade association representing many tobacco companies; Philip Morris Companies, Inc., a cigarette manufacturer; Action on Smoking and Health (ASH), an association advocating restrictions on smoking; various other groups advocating smoking restrictions; employers; employees, and other members of the general public.

Along with the live testimony, the Board received a substantial amount of documentary evidence, including reports from

state and federal agencies, scientific studies, and 33 volumes of material from Philip Morris. The Board deliberated on this issue on three separate occasions (January 12, February 2, and March 2, 1994). At its January 12 meeting, the Board accepted into the record all documentary evidence received by it since the hearing on December 16, 1993. The Board then closed the record to any further submissions from the public.

On March 2, 1994, the Board sent to the Commissioner a recommendation that smoking be prohibited in most enclosed workplaces. In a 56–page report accompanying its recommendation, the Board explained the reasons for its recommendation. The Board, relying in part on a report issued by the United States Environmental Protection Agency in December 1992, entitled *Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders,* explained that ETS is a known human carcinogen causing approximately 3,000 lung cancer deaths annually in nonsmokers nationwide. The Board further found that ETS contributes to heart disease and is responsible for 35,000 to 40,000 heart disease deaths annually. This finding was based on several reviews of the scientific literature on heart disease and ETS. In addition, the Board found that ETS is present in the workplace at levels which are consistent with causing the health effects observed in the various studies.

The Board recommended that employers have the option of designating special smoking areas that would have to satisfy certain structural and ventilation requirements. The Board also recommended that certain workplaces, most notably bars and restaurants, be excluded from the smoking ban altogether despite the fact that employees who work at such establishments are in great need of this sort of protection. This proposed exemption came in response to concern over the possible economic impact that a statewide ban on smoking may have on such establishments.

On March 8, after reviewing the Board's recommendation and certain evidence received by it on this matter, the Commissioner proposed a regulation prohibiting smoking in *all*

enclosed workplaces. The Commissioner's proposal differed from the Board's recommendation in that the regulation as proposed did not exempt restaurants, bars, taverns, and hotel and motel sleeping rooms. The Commissioner rejected these proposed exemptions after reviewing evidence concerning the possible detrimental economic impact on these establishments by the proposed smoking prohibition and finding that such an impact would be insignificant.

On April 15, 1994, the Commissioner published his proposed regulation on smoking in the workplace in the *Maryland Register* (vol. 21, issue 8). On the same day, notice was also published in the *Maryland Register* that on May 3, the Commissioner would hold a public hearing on the proposed regulation to afford interested persons the opportunity to submit data or comments in writing or orally and that until the close of business on May 17, the public could submit written comments or data on the proposed regulation to the Commissioner.

On May 3, the Commissioner conducted a public hearing at which approximately 47 witnesses testified. Among these witnesses were those testifying to the health effects of ETS, representatives from the tobacco industry, representatives from the Coalition for Smoke Free Maryland Workplaces, a representative of the Public Affairs Committee of the American Heart Association (Maryland Chapter), a certified industrial hygienist, and members of the general public.

On July 22, 1994, the Commissioner adopted COMAR 09.12.23 in the form proposed on April 15, 1994 and directed it to be published along with his reasons for such in the July 22 issue of the *Maryland Register* (vol. 21, issue 15). The final adopted regulation was to become effective on August 1, 1994. On the same day, several area businesses in Talbot County, along with several trade associations, and several tobacco companies (collectively, Appellees) filed a complaint for declaratory and injunctive relief and a motion for an interlocutory injunction in the Circuit Court for Talbot County. They sought to have COMAR 09.12.23 declared void, invalid, and

unenforceable and to enjoin its implementation. Named as defendants were William A. Fogle, then Secretary of the Department of Licensing and Regulation of the State of Maryland; the Department of Licensing and Regulation of the State of Maryland; Henry A. Koellein, the Commissioner of the Division of Labor and Industry; and the Division of Labor and Industry (collectively, the State).

On August 5, 1994, the circuit court renewed the 10–day *ex parte* injunction for another 10–day period. On August 11 and 12, 1994, the court (Horne, J.) conducted a two-day evidentiary hearing on the Appellees' motion for an interlocutory injunction. Seventeen witnesses testified, including many local businesses and two economists who testified as expert witnesses for the Appellees. The State called no witnesses. A substantial amount of documentary evidence was submitted to the court by both sides. At the conclusion of the two-day hearing, the court ruled that the Appellees had met their burden of demonstrating their entitlement to an interlocutory injunction temporarily enjoining the enforcement of COMAR 09.12.23. In response to this decision, the State asked this Court for a stay pending its appeal which was denied. We granted certiorari upon the State's appeal prior to consideration of the appeal by the Court of Special Appeals, 336 Md. 224, 647 A.2d 444.

## III.

The appropriate standards of review to be applied in proceedings involving the MOSH Act are codified at § 5–215(c) of the Labor and Employment Article. That provision states:

"(1) The court shall determine whether an order that the Commissioner passes under this title or regulation that the Commissioner adopts to carry out this title is in accordance with law.

(2) If a finding of the Commissioner on a question of fact is supported by substantial evidence, the finding is conclusive.

(3) A regulation that the Commissioner adopts to carry out this title:

(i) shall be deemed prima facie lawful and reasonable; and

(ii) may not be held invalid because of a technical defect if there is substantial compliance with this title."

■ State agencies often perform functions that are legislative in nature. *CBS v. Comptroller*, 319 Md. 687, 691–92, 575 A.2d 324 (1990). *See also Dep't of Nat. Res. v. Linchester Sand and Gravel Corp.*, 274 Md. 211, 222, 334 A.2d 514 (1975). Promulgation of new regulations by agencies is one of these so-called quasi-legislative activities. *Linchester, supra*, 274 Md. at 222, 334 A.2d 514. The regulation at issue in the instant case was adopted by way of the rule-making process.[5] Agency regulations must be consistent with the letter and the spirit of the law under which the agency acts. *Christ v. Department*, 335 Md. 427, 437, 644 A.2d 34 (1994). *See also Maryland State Police v. Warwick Supply & Equipment Co., Inc.*, 330 Md. 474, 481, 624 A.2d 1238 (1993); *Ins. Comm'r v. Bankers Independent Insurance Co.*, 326 Md. 617, 623, 606 A.2d 1072 (1992). Furthermore, while it is well-settled that there must be sufficient guidance given when legislative authority is delegated to agencies, we have held that "the modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of laws as the complexity of governmental and economic conditions increase." *Falik v. Prince George's Hosp.*, 322 Md. 409, 418, 588 A.2d 324 (1991) (citing *Sullivan v. Bd. of License Comm'rs*, 293 Md. 113, 121, 442 A.2d 558 (1982). *See also Christ, supra*, 335 Md. at 442, 644 A.2d 34.

■ In assessing the validity of a new regulation, a court must simply determine whether "the [quasi-legislative] responsibilities were properly empowered to the agency and [whether they] have been performed within the confines of the

---

5. There are certain notice, hearing, and publication requirements that must be adhered to by an agency when it acts by rule-making. *CBS, supra*, 319 Md. at 692, 575 A.2d 324. *See also* Code (1957, 1993 Repl.Vol.) §§ 10–109 through 10–113 of the State Government Article.

traditional standards of procedural and substantive fair play."[6] *Linchester, supra,* 274 Md. at 223, 334 A.2d 514. Keeping in mind concerns over maintaining sufficient separation of powers, we have held:

"This power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency. In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries."

*Weiner v. Ins. Admin.,* 337 Md. 181, 190, 652 A.2d 125 (1995) (quoting *Linchester, supra,* 274 Md. at 224, 334 A.2d 514); *Judy v. Schaefer,* 331 Md. 239, 265–66, 627 A.2d 1039 (1993) (recognizing that the scope of judicial review is more limited when the agency action is quasi-legislative, not quasi-judicial); *Storch v. Zoning Bd. of Howard Co.,* 267 Md. 476, 487, 298 A.2d 8 (1972).

Consistent with these principles, and our prior cases, § 5–215(c)(3) provides that a regulation of the Commissioner is "deemed prima facie lawful and reasonable" and may not be declared invalid for a "technical defect" if there is "substantial compliance" with the statutory mandate. The "substantial evidence" standard of judicial review, as set forth in § 5–215(c)(2), namely, whether a reasoning mind could have reached the factual conclusion the agency reached, is inapplicable as our prior cases indicate where the agency is acting in a quasi-legislative mode in considering and adopting regulations within the boundaries of its rule-making authority. *See also Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 711, 376 A.2d 483 (1977). It is thus "not the function of the courts to pass upon the wisdom of the regulation, or to

---

**6.** Determining whether rule-making authority was properly empowered to an agency requires inquiry as to whether there was a valid delegation of power to the agency and as to whether the agency acted within the scope of that delegation.

approve or disapprove it, if it does not exceed constitutional limits." *Givner v. Commissioner of Health,* 207 Md. 184, 192, 113 A.2d 899 (1954). *See also Weiner, supra,* 337 Md. at 185–87, 652 A.2d at 127; *Sugarloaf Citizens Association v. Northeast Maryland Waste Disposal Authority,* 323 Md. 641, 672–73, 594 A.2d 1115 (1991); *Crown Central Petroleum Corp. v. City Council of Baltimore,* 258 Md. 82, 85, 265 A.2d 192 (1970). Finally, we have determined that courts should generally defer to agencies' decisions in promulgating new regulations because they presumably make rules based upon their expertise in a particular field. *Givner, supra,* 207 Md. at 192, 113 A.2d 899. This is especially true of agencies working in the area of health and safety, which rely extensively on their specialized knowledge of that area in promulgating regulations. *Id.* at 191, 113 A.2d 899.

In the present case, the Appellees seek to have COMAR 09.12.23 declared void pursuant to § 10–129 of the State Government Article, which states in pertinent part: "The court shall declare a provision of a regulation invalid if the court finds that: (1) the provision violates any provision of the United States or Maryland Constitution; (2) the provision exceeds the statutory authority of the unit; or (3) the unit failed to comply with statutory requirements for adoption of the provision." It is thus clear that the scope of our appellate review in this case is limited. We do not undertake to finally determine the merits of the Appellees' arguments at this time. Rather, we will merely review whether the trial court erred in granting the interlocutory injunction.

In *Department of Transportation v. Armacost,* 299 Md. 392, 474 A.2d 191 (1984), we set forth four specific factors that a court must find to exist before it may issue an interlocutory injunction. We decided that

"[a]s a general rule, the appropriateness of granting an interlocutory injunction is determined by examining four factors: (1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by

granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest." *Id.* at 404–05, 474 A.2d 191 (citing *State Dep't of Health and Mental Hygiene v. Baltimore County,* 281 Md. 548, 554–57, 383 A.2d 51 (1977)).

The burden of proving the facts necessary to satisfy these factors rests on the party seeking the interlocutory injunction. *Id.* 299 Md. at 405, 474 A.2d 191. In addition, the party seeking the injunction must prove the existence of *all four* of the factors set forth in *Armacost* in order to be entitled to preliminary relief. *Id.* The failure to prove the existence of even one of the four factors will preclude the grant of preliminary relief. *Id.*

It is well-accepted that if a party cannot establish that it has a likelihood of success on the merits, then no interlocutory injunction should be granted. More precisely, "if the facts as stated in the bill of complaint or, when appropriate, as shown by the evidence, are not 'full and sufficiently definite and clear, in support of the right asserted, and that such right has been violated,' the court will not order preliminary relief." *State Dep't of Health and Mental Hygiene v. Baltimore County, supra,* 281 Md. at 554, 383 A.2d 51. This appears to create a standard by which the party seeking the interlocutory injunction must establish that it has a real *probability* of prevailing on the merits, not merely a remote *possibility* of doing so.

Furthermore, we have found that in litigation between governmental and private parties, or in cases in which injunctive relief directly impacts governmental interests, "the court is not bound by the strict requirements of traditional equity as developed in private litigation." *Id.* at 555, 383 A.2d 51. We have also acknowledged that "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Space Aero Products Co., Inc. v. R.E. Darling Co., Inc.,* 238 Md. 93, 128,

208 A.2d 74, *cert. denied*, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965).

On the record before us, we conclude that the Appellees have little likelihood of prevailing on the merits in any of the counts they set forth in their complaint. It is, therefore, unnecessary for us to address the other three *Armacost* requirements, and, consequently, we shall vacate the interlocutory injunction.

### (A)

### The Commissioner's Statutory Authority to Promulgate Occupational Safety and Health Standards

The Appellees argue that the Commissioner exceeded his statutory authority as a matter of law by failing to adhere to certain applicable state and federal requirements for the promulgation of occupational safety and health standards, thereby rendering COMAR 09.12.23 invalid. We find that the Commissioner did not exceed his statutory authority in promulgating the regulation.

### (1)

### The "Significant Risk" Test

The Appellees contend that the Commissioner disregarded federal precedent on the promulgation of occupational safety and health standards that was binding on him. They claim that the Commissioner did not properly apply the "significant risk" test set forth by the United States Supreme Court in the so-called *Benzene* case, *Industrial Union Dep't, AFL–CIO v. American Petroleum Institute*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980),[7] as he was required to do. The Appellees maintain that the Commissioner did not establish by the "best available evidence" in the rule-making record: (1) that workplace exposure to ETS, the alleged health hazard at

---

7. The *Benzene* holding was later adopted by a majority of the Court in *American Textile Manufacturers Institute v. Donovan*, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981).

issue in this case, creates a "significant risk" of material health impairment at levels currently found in Maryland workplaces, and (2) that all the requirements imposed by COMAR 09.12.23, which include a zero exposure limit for non-smoking employees, are "reasonably necessary and appropriate" to significantly reduce a significant risk of material health impairment in Maryland workplaces, as is required by *Benzene*.

Furthermore, the Appellees argue that the Commissioner did not show that *completely* eliminating ETS from the workplace was reasonably necessary to reduce a significant risk of material health impairment as *Benzene* requires and, therefore, he exceeded his statutory standard-setting authority in promulgating COMAR 09.12.23. They further maintain that before the Commissioner can completely ban ETS from all Maryland workplaces, he must establish in the rule-making record that a less than total elimination of ETS would not adequately reduce the risk of material health impairment to employees and that he did not do so in this case. According to the Appellees, the Commissioner was required to demonstrate that eliminating any level of ETS, no matter how minute the exposure, was necessary to yield a significant discernible benefit. As to this, the Appellees argue that there is no evidence in the rule-making record that a total elimination of ETS is necessary. The Appellees further suggest that the Commissioner did not consider less restrictive alternatives to a complete ban on smoking in the workplace that might reduce the alleged health risk from ETS to an insignificant level and he also did not provide an adequate explanation for why he chose the provisions that he ultimately promulgated.

 As earlier observed, our review of the validity of the new regulation is limited to determining whether it was promulgated in accordance with the governing law. Thus, if the legislative facts are adequate to sustain the Commissioner's rule-making, we do not substitute our judgment on the conclusions to be drawn from the legislative facts. In this regard, we afford great deference to the Commissioner's findings concerning occupational safety and health standards, which

are often based on his experience in understanding a multitude of complex scientific and factual data submitted to him throughout the rule-making process. There was abundant scientific evidence in the record to justify the Commissioner's conclusion that ETS constitutes a "significant risk" to the health of Maryland employees due to its established connection to a higher incidence of lung cancer and heart disease in those workers exposed to it and, therefore, warranting the adoption of COMAR 09.12.23. *See* the Decision of Commissioner of Labor and Industry on Proposed Regulation to Prohibit Smoking in Enclosed Workplaces, 21 *Maryland Register* 1336, 1337–48 (July 22, 1994). *See also* Report of the Maryland Occupational Safety and Health Advisory Board Regarding Tobacco Smoke in the Workplace at 2–29 (Board's Report).

There is also a sufficient evidentiary foundation in the record to permit the Commissioner to conclude that this "significant risk" to employees' health should be regulated by way of a complete prohibition against smoking in all enclosed workplaces with the limited exception for designated smoking areas, as was adopted by the Commissioner. The Commissioner issued a detailed report explaining his decision, replete with a multitude of highly technical scientific and factual data. The Commissioner's report included a discussion of possible alternative methods or levels of regulation to a total smoking ban in all enclosed workplaces. The report also included an explanation why the complete prohibition was chosen, contrary to the Appellees' argument that no such alternatives were presented by the agency. Some of these possible alternatives included: limiting smoking, increasing ventilation, and providing designated smoking areas with and without special ventilation. Decision of Commissioner at 1348.

Finally, there was a sufficient foundation in the record to support the Commissioner's conclusion that, on the present state of evidence, it is impossible to set a safe level of ETS because no such safe or threshold level is now known at which ETS would not pose a health hazard to Maryland employees, or which can be easily ascertained through current scientific

knowledge; and, if one could be ascertained, it would be so low that it would be meaningless from a regulatory perspective.[8] The rule-making record in this case contained several scientific studies supporting this conclusion. Decision of Commissioner at 1349.

▬ The Appellees also argue that the Commissioner's decision was not based upon the "best available evidence" as required by § 5–309(c) of the MOSH Act, because the Commissioner ignored contrary evidence that supported their position. It is, however, a well-established administrative law principle that the existence in the record of evidence contrary to the agency's conclusion does not prevent its decision from being promulgated in accordance with the governing law. We do not second guess the judgmental basis upon which the agency chose to weigh the conflicting evidence. Consequently, we find that the Commissioner's conclusions in each of the areas discussed above are adequately supported by the rule-making record.

### (2)

### Economic Impact/Feasibility Analysis

▬ The Appellees next contention is that the Commissioner failed to conduct an adequate assessment of COMAR 09.12.23's economic impact and feasibility, as is required by Maryland's Administrative Procedure Act (APA), Code (1957, 1993 Repl.Vol.), §§ 10–101 *et. seq.* of the State Government Article. Under the Maryland APA, before the Commissioner adopts an occupational safety and health standard, he must publish in the *Maryland Register* a statement detailing "the estimated economic impact of the proposed regulation on . . . groups such as consumer, industry, taxpayer, or trade groups; and give persons an opportunity to comment before adoption of the proposed regulation." § 10–112(a)(3).

---

**8.** Additional support for this conclusion may be attributed to the finding that, unlike benzene, ETS is not indispensible to any job and, therefore, there is less reason to avoid banning it completely in the workplace.

For purposes of this section, a "business" is defined as "a trade, professional activity, or other business that is conducted for profit." § 10–124(a). In evaluating COMAR 09.12.23, the Commissioner would have had to specifically consider "the costs that the proposed regulation would impose on each [group]; and the difficulty of compliance for each [group]." § 10–124(b)(2)(ii). The Appellees contend that the Commissioner's April 15, 1994 statement published in the *Maryland Register* failed to meet these statutory requirements concerning economic impact analysis.

In addition to the previously-stated statutory requirements, the MOSH Act requires that each occupational safety and health standard should "adequately ensure, to the extent feasible on the basis of the best available evidence, that no employee ... will suffer material impairment of health or functional capacity." § 5–309(c). The term "feasible" has been interpreted to mean technologically and economically capable of being done. The costs of a proposed regulation should not threaten to completely destroy a certain industry.

Since the formulation of an economic impact statement requires the Commissioner to make factual findings concerning the possible economic impact on all potentially affected industries, we evaluate the propriety of the Commissioner's actions in this regard. The Commissioner addressed the possible economic impact of COMAR 09.12.23 at two different times during the rule-making process; first, he published a statement, "The Estimate of Economic Impact," in the April 15, 1994 issue of the *Maryland Register*, along with the proposed regulation and, second, he issued a statement as part of his Report explaining his decision concerning the promulgation of the regulation that was published in the *Maryland Register* on July 22, 1994. The latter discussed the economic impact and feasibility of COMAR 09.12.23 in great detail. *See* Decision of Commissioner at 1349–51. The Commissioner's Decision cites the testimony of a number of witnesses as well as several studies, which support his conclusion that the economic impact of COMAR 09.12.23 on the hospitality industry will be minimal. *See id.* at 1350. The Appellees contend

that these two statements are inadequate to satisfy the statutory requirements concerning the economic impact statement. We think that the Commissioner's findings were legally sufficient based on the information before him in this case.

(3)

### Meaningful Opportunity for Public Comment

■■■ The Appellees argue that the State exhibited an "unalterably closed mind" concerning the need for a workplace smoking ban and the evidence relating thereto and thereby deprived them of their meaningful opportunity for public comment on the proposed regulation as is required by the Maryland APA. They also contend that the State had made its decision to impose the workplace smoking ban before the time for public comment had even ended and before any meaningful evaluation of the evidence submitted to it concerning the regulation had taken place. To prevail on this argument, the Appellees would have to demonstrate actual bias on the part of the State, which they have not done on the record before us. To prove that the State demonstrated bias in promulgating COMAR 09.12.23, the Appellees would have to show that the Commissioner acted with "an unalterably closed mind on matters critical to the disposition of the proceeding." *United Steelworkers v. Marshall*, 647 F.2d 1189, 1209 (D.C.Cir.1980) (citing *Ass'n of National Advertisers v. FTC*, 627 F.2d 1151 (D.C.Cir.1979)).

We do not believe that the Commissioner displayed the requisite bias to disqualify him from the rule-making process or to invalidate COMAR 09.12.23. The rule-making process in this case was comprehensive. Several public hearings were held to allow public comment on the proposed regulation. A great deal of live testimony was heard by the Board and the Commissioner concerning the proposed regulation. A multitude of documentary evidence was submitted to the Commissioner for his review with regard to the proposed regulation. The Decision of the Commissioner published in the July 22, 1994 issue of the *Maryland Register* sets forth his explanation

for the choices that he made in promulgating COMAR 09.12.23 in light of the evidence presented to him throughout the rule-making process.

That the Commissioner did not change his position regarding COMAR 09.12.23 in light of contrary evidence in the rule-making record does not mean that there was not a meaningful opportunity for comment. Indeed, there was such an opportunity and the opponents of the regulation commented at considerable length. The Commissioner's final decision, made with all his knowledge and expertise in the area of occupational safety and health, was to adopt COMAR 09.12.23 in the form it was in when it was published in the *Maryland Register* on April 15, 1994. That was ultimately the Commissioner's decision to make and we see no error.

(4)

Preemption of Regulation of Smoking in
the Workplace by General Assembly

The Appellees argue that because the General Assembly has enacted many statutes regulating the use of tobacco products in the workplace [9] and has rejected many such statutory proposals on this subject as well, that these actions, especially those that came subsequent to the MOSH Act's enactment in 1973, suggest the General Assembly's intent to regulate smoking in the workplace in a specific manner. Further, they assert that the General Assembly's actions in this area suggest its intent to preempt all other regulation in this area by other bodies. Accordingly, the Appellees argue that the Commissioner's actions in promulgating COMAR 09.12.23 exceeded his statutory authority.

We have held: "The doctrine of pre-emption is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of

---

9. *See, e.g.,* Article 78, § 35A; Article 89, § 64; Article 38A, § 23(b); Health–General Article, §§ 24–205 and 24–502; Transportation Article, § 7–705(b)(2).

legislative concern." *Allied Vending v. Bowie,* 332 Md. 279, 297, 631 A.2d 77 (1993) (quoting *Ad + Soil, Inc. v. County Comm'rs,* 307 Md. 307, 324, 513 A.2d 893 (1986)). A state law may preempt a local law or regulation in one of three ways: 1) by conflict, 2) expressly, or 3) by implication. *Id.* 332 Md. at 297–98, 631 A.2d 77. The Appellees argue that this is a case of implied preemption, which presents itself in situations "when the legislature ... so forcibly express[es] its intent to occupy a specific field of regulation that the acceptance of the doctrine of pre-emption by implication is compelled." *Id.* at 298, 631 A.2d 77 (quoting *Mayor of Baltimore v. Sitnick,* 254 Md. 303, 323, 255 A.2d 376 (1969)). There is no set formula for determining whether the legislature has intended to preempt an entire area; however, "the primary indicia of a legislative purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field." *Id.* 332 Md. at 298–99, 631 A.2d 77. *See also Talbot County v. Skipper,* 329 Md. 481, 487–88, 620 A.2d 880 (1993). Implied preemption has clearly not occurred in the present case. While the General Assembly has passed legislation addressing the health effects of smoking on Maryland citizens, it has not regulated smoking in so all-encompassing a fashion as to suggest that it meant to reserve to itself for direct legislative action all regulation of smoking.

## (B)

### Whether Products Clause of the MOSH Act Violated by COMAR 09.12.23

The Appellees contend that COMAR 09.12.23 unduly burdens interstate commerce, thereby violating the Products Clause of the MOSH Act. The Products Clause places special statutory limitations on the promulgation of occupational safety and health standards that affect products that flow in interstate commerce. The MOSH Act requires that the Commissioner shall not adopt an occupational safety and health standard that puts "an undue burden on interstate commerce when: (i) a local condition ... requires the application of an occupational safety and health standard that differs from a

federal standard; and (ii) applied to a product ... that is distributed or used in interstate commerce." § 5–309(a)(2).

The Appellees suggest that COMAR 09.12.23 applies to tobacco products, which are distributed in interstate commerce, and that it substantially differs from all current federal OSHA standards in the area of smoking regulations. They argue that COMAR 09.12.23 is not required by a local condition unique to Maryland workplaces because ETS presents the same alleged health hazards in every state. It is further argued that it is clear that COMAR 09.12.23 unduly burdens interstate commerce in tobacco products because an implementation of the workplace smoking ban will lead to a significant reduction in consumption of tobacco products in this State. The Appellees also argue that less restrictive means could accomplish the same goals as the complete ban on workplace smoking with less burden on interstate commerce. We agree with the State's position that because the federal government has yet to adopt a specific standard with respect to the health effects of ETS in enclosed workplaces, it leaves Maryland free to promulgate its own regulation in this area without being constrained by the Products Clause.

### (C)

### The Due Process Clause

### (1)

The Appellees argue that in order for the Commissioner to validly adopt a state occupational health and safety standard concerning an issue about which a federal standard has also been promulgated, he must get OSHA approval of the standard to ensure compliance with federal requirements. 29 U.S.C. § 667(c). As to this, OSHA has, according to the Appellees, issued many standards regarding smoking in the workplace, but the Commissioner failed to submit COMAR 09.12.23 to OSHA for its approval.

The Appellees further maintain that OSHA would not have approved COMAR 09.12.23, even if it had been submitted to it,

because while it applies to products flowing in interstate commerce, it is not required by "compelling conditions" and it "unduly burden[s] interstate commerce" in violation of the federal OSH Act's Products Clause. 29 U.S.C. § 667(c)(2). They contend that adoption of COMAR 09.12.23 before obtaining OSHA approval deprived them of any meaningful opportunity to comment to federal OSHA concerning the regulation's compliance with federal requirements. Such a meaningful opportunity to comment, they say, is a right afforded to all interested persons under the federal OSH Act. 29 C.F.R. § 1902.11. The Appellees assert that this deprivation of their right to be heard constitutes a violation of the due process guarantees contained in Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment of the United States Constitution. Since we find that the Products Clauses do not apply in this case, this argument of the Appellees must also fail.

(2)

Unconstitutional Vagueness

The Appellees argue that COMAR 09.12.23 is unconstitutionally vague in its temporal and physical scope and application in that it fails to provide the necessary legally fixed standards and adequate guidelines to allow equitable enforcement in the future. They further contend that it is impossible to ascertain from COMAR 09.12.23 which structures, and at what times, various provisions of the regulation apply in order to ensure proper compliance. Because substantial monetary penalties may attach for violation of COMAR 09.12.23, the Appellees argue that it is only fair that the regulation's coverage be clear. Without such clarity, they maintain that adoption of COMAR 09.12.23 would amount to a denial of their right not to be deprived of property without due process of law in violation of Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment of the United States Constitution.

We have held: "Generally, the constitutionality of a statute challenged on vagueness grounds must be considered

as applied to the facts of the particular case." *Ayers v. State,* 335 Md. 602, 624, 645 A.2d 22 (1994). Furthermore, "[i]t is well settled that a statute which prohibits the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess at its meaning and differ as to its application violates the constitutional guarantee of due process of law." *Tidewater v. Mayor and City Council of Havre De Grace,* 337 Md. 338, 349–50, 653 A.2d 468 (1995) (quoting *Blum v. Engelman,* 190 Md. 109, 113, 57 A.2d 421 (1948)). *See also Condon v. State,* 332 Md. 481, 499, 632 A.2d 753 (1993); *Williams v. State,* 329 Md. 1, 8, 616 A.2d 1275 (1992). We must therefore decide if COMAR 09.12.23 is "sufficiently definite to provide notice of the conduct it prohibits or requires and to guide those that must apply it." *Lussier v. Maryland Racing Comm'n,* 100 Md.App. 190, 219, 640 A.2d 259 (1994). *See also Williams, supra,* 329 Md. at 13, 616 A.2d 1275 (quoting *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972)).

The State contends that no serious question exists concerning the purported vagueness of the Commissioner's regulations. We agree. Just because COMAR 09.12.23 is broad does not necessarily make it vague. We believe that persons of ordinary intelligence will be perfectly capable, without having to guess, of understanding this regulation's meaning and application, i.e., what conduct on their part is affected by the regulation.

### (D)

### Right to Privacy

The Appellees argue that COMAR 09.12.23 violates their state and federal right to privacy found in the "penumbra" of Articles 2, 8, 19, 24, 26, 40, and 45 of the Maryland Declaration of Rights and the 1st, 4th, 9th, and 14th Amendments to the United States Constitution in that they interpret this regulation as prohibiting smoking in private homes, sleeping rooms in hotels and motels, and private vehicles in which

at least one employee is working. The Appellees point to the zone of privacy that exists in one's home that was recognized by the Supreme Court in *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In that case, the Court held: "The right to be free except in limited circumstances from unwanted governmental intrusions into one's privacy is fundamental." *Id.* at 564, 89 S.Ct. at 1247–48.

We need not decide whether the constitutional right to privacy would protect a person from being forbidden to smoke in his own home if one or more persons are employed there. The Commissioner in his Decision published in the July 22, 1994 *Maryland Register* specifically finds that such conduct is *not* implicated by COMAR 09.12.23. He said:

"Assuming that smoking is entitled to the same constitutional protection as procreation, which the Commissioner doubts, the regulation actually does not have the effect Philip Morris alleges. Philip Morris constructs its argument from the definition of 'Employer' in Section 5–101(d), which states 'Employer means . . . a person who is engaged in commerce, industry, trade, or other business in the State and employs at least one employee in that business.' According to Philip Morris, the phrase 'employs at least one employee in that business' arguably would extend to a nanny, maid or other person hired for work in a private home. The Commissioner believes that Philip Morris's view is not even arguable. The phrase 'that business' refers to the earlier listing of 'commerce, industry, trade or other business,' which cannot reasonably be read to extend to an individual that, for example, an accountant hires to mind her children or clean her home."

*See* Decision of Commissioner at 1351. We find this statement to be dispositive of the agency's intent as to the scope of COMAR 09.12.23. Further evidence of this intent is that at a June 15, 1994 hearing concerning COMAR 09.12.23, the Assistant Secretary of Licensing and Regulation, Nancy Burkheimer, stated, in response to a question about whether the regulation could be enforced against private homeowners, that "MOSHA is not in the business of going into people's homes."

(E)

## The First Amendment

The Appellees contend that COMAR 09.12.23's sign posting provision as it would be applied to private homes and vehicles violates their state and constitutional right to freedom of speech as protected by Article 40 of the Maryland Declaration of Rights and the First Amendment of the United States Constitution. They argue that the required posting of "no smoking" signs at the entrance of every enclosed workplace would constitute "forced speech" prohibited by the First Amendment [10] *See Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Pacific Gas & Electric v. Public Utilities Comm'n of California*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

We agree with the State that this case does not present "the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the purpose that it be observed and read by the public." *Wooley, supra*, 430 U.S. at 713, 97 S.Ct. at 1434–35. The sign posting requirement was clearly designed to protect the health and safety of workers and cannot be construed as an attempt to compel employers to use their private property as a billboard for the State's ideological message.

## IV.

There being virtually no likelihood of success for the Appellees in this case, we conclude that the granting of an

---

**10.** The Appellees suggest that this sign posting requirement would reach as far as to affect private homeowners. As we discussed above, the intent of the agency was not to reach private homes unless they have been transformed in part into a business and, even in that case, only the transformed section of the home would be affected by COMAR 09.12.23.

interlocutory injunction constituted an improper exercise of judicial discretion by the trial judge. Accordingly, we shall vacate the interlocutory injunction and remand the matter for trial on the merits of the Appellees' complaint. The regulation will become fully effective upon the filing of this Court's mandate thirty days after the filing of this opinion unless stayed in the interim or otherwise suspended by Executive Branch action.

*INTERLOCUTORY INJUNCTION VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR TALBOT COUNTY FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEES.*