896 A.2d 320

**ADVENTIST HEALTH CARE INC.**

**v.**

**MARYLAND HEALTH CARE COMMISSION, et al.**

**No. 73, Sept. Term, 2005.**

Court of Appeals of Maryland.

April 12, 2006.

---

Howard L. Sollins (Diane Festino Schmitt, Ober, Kaler, Grimes & Shriver, Baltimore, on brief), for appellants.

Jason W. Sapsin, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Jane E. Pilliod, Suellen Wideman, Asst. Attys. Gen.), Paul S. Caiola (Jack C. Tranter, Gallagher Evelius & Jones, LLP, Baltimore, on brief), for appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BELL, C.J.

The Maryland Health Care Commission ("Commission"), one of the appellees herein, is required by Md.Code (1982, 2005 Replacement Volume), § 19–118 of the Health–General Article,[1] "at least every 5 years," to adopt a State health plan ("SHP"), § (a)(1), that shall include "[t]he methodologies, standards, and criteria for certificate of need review...." § 19–118(a)(2)(i). Moreover, the Commission is charged with developing standards and policies consistent with the SHP that relate to the Certificate of Need ("CON") process. § 19–118(d)(1).[2] These standards, *inter alia*, "[s]hall address the availability, accessibility, cost, and quality of health care," § 19–118(d)(2)(i),[3] and "shall take into account the relevant methodologies of the Health Services Cost Review Commission." § 19–118(d)(3).[4] The Commission also is authorized to promulgate regulations in order more effectively to manage and implement the duties prescribed under Md.Code § 19–118. Section 19–118(c) provides:

---

1. All future references will be to the 2005 Replacement Volume of the Health–General Article unless otherwise indicated.

2. Section 19–118(d)(1) provides:
 "The Commission shall develop standards and policies consistent with the State health plan that relate to the certificate of need program."

3. Section 19–118(d)(2) provides:
 "(2) The standards:
 "(i) Shall address the availability, accessibility, cost, and quality of health care; and
 "(ii) Are to be reviewed and revised periodically to reflect new developments in health planning, delivery, and technology."

4. Section 19–118(d)(3) provides:
 "(3) In adopting standards regarding cost, efficiency, cost-effectiveness, or financial feasibility, the Commission shall take into account the relevant methodologies of the Health Services Cost Review Commission."

"(c) The Commission shall adopt rules and regulations that ensure broad public input, public hearings, and consideration of local health plans in development of the State health plan."

The issue in this case is whether a request by a merged asset hospital system to relocate a portion of its existing cardiac surgery program from one location to another triggers or engages the comparative review process required upon application for a CON for a new cardiac surgery program, or whether such request is to be resolved by a CON process that is separate and distinct. The problem, and accordingly, the resolution, relates solely to the interpretation of the Code of Maryland Administrative Regulations ("COMAR") 10.24.17.04F, the section entitled "Merged Hospital Systems," and, specifically, Policy 6.0 contained therein. COMAR 10.24.17.04F provides:

"The regionalization of cardiac surgery services plays an important role in the strategic planning and placement of these programs to achieve an optimal balance between promoting patient access, containing costs, and maintaining quality of care. By regulating the number of cardiac surgery programs needed by Maryland residents in order to ensure adequate caseloads, the Commission acts to strengthen quality and avoid unnecessary costs to the healthcare system.

"In recent years, the Commission has encouraged and overseen several mergers and consolidations of two or more hospitals as part of statewide initiatives to promote efficiencies and contain health costs. This has created an opportunity, under specified conditions, for merged institutions to relocate all or part of an existing service from one hospital to another under that merged system by obtaining an exemption from Certificate of Need. While the General Assembly has created this opportunity for the reconfiguration of existing services, its intention was not to promote the expansion of a service which otherwise would be subject to Certificate of Need coverage. The potential relocation or dividing of cardiac surgery programs may result in prolifer-

ation of programs in the absence of need, and defeat the principles of regional planning. For this reason, the Commission establishes the following policy:

"Policy 6.0 A merged hospital system may not relocate any part of its existing cardiac surgery capacity to another hospital within its system without obtaining a Certificate of Need."

The Commission interpreted COMAR 10.24.17.04F to mean that a relocation of a portion of an existing cardiac surgery program is subject to the CON process required for a new program. In so doing, it rejected the interpretation advocated by the appellant, Adventist Health Care, Inc., the parent of the merged hospitals, Washington Adventist Hospital and Shady Grove Hospital. Adventist had urged, and continues in this Court to do so, that its relocation application was entitled to be reviewed in ʌ separate and distinct process from the comparative review required for the establishment of a new program. Consequently, it maintained on judicial review, and again in this Court, that, by interpreting Policy 6.0 and COMAR 10.24.17.04F the way it did, the Commission exceeded its authority. On judicial review, the Circuit Court for Baltimore City affirmed the Commission's interpretation. We also shall affirm.

## A.

Adventist is a merged asset hospital system that includes, as indicated, both the Washington Adventist Hospital and Shady Grove Hospital. The Washington Adventist Hospital has an existing cardiac surgery program. Interested in relocating a portion of that existing cardiac surgery program to Shady Grove Hospital, Adventist submitted to the Commission a Letter of Intent ("LOI") to do so. The LOI described the proposed project, the quantity and types of health services beds that would be affected, and, under the applicable need methodology in the SHP, the jurisdictions the new service would affect. Explaining that the new joint program would have "common medical staffs for Program services, a single

set of Program policies and procedures," Adventist concluded that the relocation "would not result in the establishment of a new Program but rather [only in] the relocation of a portion of the existing Program at Washington Adventist."

To be clear as to the latter point, Adventist submitted to the Commission, along with the LOI, a separate letter in which it reaffirmed that it was not seeking a Certificate of Need for a new program, and stated that it was not responding to an earlier notice, issued by the Commission, requesting LOI's for new cardiac surgery programs.[5] Adventist explained, in that regard:

"We wish to avoid a situation wherein the Commission would either reject this letter of intent or any subsequently filed application. We are therefore seeking your guidance whether there is any reason why this letter of intent cannot be accepted. We further request a determination that the project proposed in the letter of intent is considered a partial relocation of an existing program and not the establishment of a new program."

Responding, the Commission advised that it considered Adventist's LOI to relocate a portion of its cardiac surgery program to be a request for a new program. It explained that "[i]t is the Commission's view that Policy 6.0 . . . considers the relocation of a cardiac surgery program by a merged asset system as the establishment of a new program, and, therefore, subject to all of the policies and standards under COMAR 10.24.17."

This prompted Adventist to file its "Petition for Acceptance of Letter of Intent for Partial Relocation of an Existing Cardiac Surgery and Percutaneous Coronary Intervention Program" ("Adventist Petition"). In a supporting memoran-

---

**5.** In the March 19, 2004 Maryland Register, the Commission had given notice that applicants seeking to file LOI's to apply for a CON for a new cardiac surgery program must do so by March 26, 2004, and that such applications for new programs would be considered pursuant to the Commission's "comparative review process" as outlined in COMAR 10.24.01.07B.

dum accompanying the Petition, Adventist described what had already transpired, and argued that the LOI complied with Policy 6.0, that Policy 6.0's plain language required an independent, non-comparative review of its LOI, and that the health care resources that Adventist already possessed most efficiently would be utilized by allowing the relocation.

The Petition relied on three examples which, it maintained, demonstrated that the Commission's regulations allowed for the relocation of all, or part, of existing services between hospitals within a merged asset system: the Health Resources Planning Commission's granting of an exemption, pursuant to which Greater Laurel Beltsville Hospital (now Laurel Regional Hospital) was permitted to establish an obstetrics program under its merged asset system, the Commission's approval of the partial relocation from Sinai Hospital of Baltimore to Northwest Hospital Center, of inpatient psychiatric services, without the need for establishing a need for a new health care service, and the Commission's Proposed Decision granting the University of Maryland Medical System an exemption to relocate an obstetrics program. As to this third example, Adventist pointed out that the Commission noted that an allowable change in patient services among the components of a merged organization included the establishment of a service at a facility within the merged organization.

Adventist acknowledged that all of these examples involved a merger exemption, but insisted that they nevertheless reflected a distinction being drawn between the treatment of "new" and "existing" services. Furthermore, it asserted:

"[t]he Commission, in fact, has adopted other regulations permitting CON exemptions for merged asset systems for projects which otherwise would require CON coverage. It would be illogical and inconsistent for the Commission to, on the one hand, apply the 'merger and consolidation' exemption process to permit the establishment of a service that was not previously available at a hospital within a merged asset system while, on the other hand[,] treating a partial relocation of another service as a 'new' service."

Pursuant to this, Adventist argued that treating its proposal as a "new program" would be inconsistent with these and other examples, and with the Commission's enabling statute. The petition further asserted that the language of Policy 6.0 did not equate a partially relocated program to a "new" program.

Over Adventist's objection, the Commission submitted Adventist's LOI and Petition to the hospitals participating in the comparative review for a new cardiac surgery program for their review and comment, pursuant to § 19–126.[6] Suburban Hospital, the other appellee in this case, and Holy Cross Hospital, responded as interested parties[7] and opposed the Adventist Petition.

Following the comparative review proceedings and as a part of the CON review process,[8] the Commission issued its deci-

---

6. Section 19–126(a) provides:
 "(a) If the Commission receives an application for a certificate of need for a change in the bed capacity of a health care facility, as required under § 19–120 of this subtitle, or for a health care project that would create a new health care service or abolish an existing health care service, the Commission shall give notice of the filing by publication in the Maryland Register and give the following notice to:
 "(1) Each member of the General Assembly in whose district the action is planned;
 "(2) Each member of the governing body for the county where the action is planned;
 "(3) The county executive, mayor, or chief executive officer, if any, in whose county or city the action is planned; and
 "(4) Any health care provider, third party payor, local planning agency, or any other person the Commission knows has an interest in the application."
 What occurred in this case was unusual. Adventist submitted two letters and a Petition with memorandum to the Commission. The Commission took these documents and submitted them for comparative review as Adventist's "application for a certificate of need."

7. An "interested party" may, pursuant to Md.Code, Health–Gen § 19–126(d)(7), "submit written comments on the application in accordance with procedural regulations adopted by the Commission."

8. Typically, when an application for a CON for the creation of a new health care service has been filed with the Commission and circulated among the interested parties for review and comment, § 19–126(a), the Commission staff within 10 working days "shall review" it for com-

sion with respect to the proper forum for deciding Adventist's relocation petition.[9] It confirmed its preliminary determination, that the 2004 SHP required Adventist's petition for partial relocation of its cardiac surgery program to be considered within the ongoing comparative review process normally engaged to evaluate CON's for new programs. The Commission reasoned:

> "if every hospital that is a member of a merged asset system were able to establish an open heart surgery program ... the number of open heart surgery programs would more than double, none of which would be considered 'new' capacity, ... undermin[ing] the intent of the policy

---

pleteness and may request further information. § 19–126(d)(3). Thereafter, the Commission

"may delegate to a reviewer the responsibility for review of an application for a certificate of need, including:

"(i) The holding of an evidentiary hearing if the Commission, in accordance with criteria it has adopted by regulation, considers an evidentiary hearing appropriate due to the magnitude of the impact the proposed project may have on the health care delivery system; and

"(ii) Preparation of a recommended decision for consideration by the full Commission,"

§ 19–126 (d)(4), and "shall designate a single Commissioner to act as reviewer for the application and any competing applications." § 19–126(d)(5). Thereafter, the reviewer, after "review[ing] the application, any written comments on the application, and any other materials permitted by this section or by the Commission's regulations," shall present a recommended decision on the application to the full Commission. § 19–126(d)(9). Any applicant or interested party may be permitted, upon request and consistent with Commission Regulations, to present oral argument to the reviewer, prior to the preparation of the recommended decision on the application. § 19–126(d)(10)(i). Finally, § 19–126(d)(11) gives interested parties who have submitted written comments the right to submit written exceptions to the proposed decision and oral argument before the Commission takes final action on the application.

This process was followed in this case.

9. Section 19–126(d)(12) provides:

"(12) The Commission shall, after determining that the recommended decision is complete, vote to approve, approve with conditions, or deny the application on the basis of the recommended decision, the record before the staff or the reviewer, and exceptions and arguments, if any, before the Commission."

and the principles of regional planning for specialized services."

Addressing directly the examples Adventist proffered as demonstrating that a relocation CON is subject to a different review process than is a new health care service CON, the Commission determined that there was "no inconsistency between these cases and the Commission's rejection of Adventist HealthCare's request for a separate CON review," pointing out that they "involved the applicability of the merger exemption to the CON process," and "are focused on the General Assembly's intent in creating the merger exemption for certain projects." It concluded that the merger exemption was not at issue in this case and, in any event, "the reconfiguration of obstetrics and psychiatric services in the way proposed by the hospital systems in those cases were the kind of service reconfiguration the General Assembly intended to permit via the CON exemption process."

In addition, the Commission mentioned that the disposition of the cases relied on by Adventist was supported by the applicable SHP Chapter. It then observed:

"[B]y contrast, Policy 6 of the OHS Chapter is predicated on the Commission's determination that 'partial relocations' of regionally-planned-for services like open heart surgery services should be treated like new programs. As a practical matter, any 'partial relocation' of these specialized services operates more like the establishment of a new program than does a relocation of obstetrics or psychiatric beds. For example, because of volume/quality concerns present in planning for open heart surgery services and because the quality of an open heart surgery service is highly dependent on a team of health care practitioners working together on a high volume of surgeries, it is not possible, nor is Adventist HealthCare proposing, to simply relocate the [Washington Adventist Hospital's] staff to [Shady Grove Adventist Hospital] or to divide Staff time between the two hospitals. Even if the training protocols and the surgeons remain the same across the system, the [Shady Grove Adventist Hospital's] program will inevitably

have a different support team of nurses and technicians who, through an integral part of the program, may not have the same experience working with each other or with the cardiac surgeons in [Washington Adventist Hospital's] high volume program. In this respect, the 'partial relocation' of the [Washington Adventist Hospital] program resembles a new program."

It concluded, more explicitly, "[a] partial relocation within a system can be expected to have some impact on volumes of other service providers just as a new program would.... Reviewing these proposals separately, based simply on a distinction in nomenclature, makes no sense."

Finally, the Commission rejected the argument that if Adventist's proposal was not a "new" program, it was obliged to treat it as Adventist maintains, and review it as a separate and distinct matter. That, the Commission asserted, does not follow. Finding no legal requirement that it do so, the Commission found it acceptable to treat Adventist's proposal and a typical CON application as similar types of proposals in a single comparative review because both involved open heart services and both required a CON. The Commission concluded that "administrative efficiency and fairness, as well as the public interest in the Commission making a reasoned decision in light of all material evidence, compel the conclusion that a separate CON review of the Adventist's proposal is unwarranted."

Adventist filed in the Circuit Court for Baltimore City a petition for judicial review, pursuant to Maryland Rule 7–202.[10]

Following a hearing, the Circuit Court issued its Memorandum and Order affirming the Commission's decision. Perceiving the issue to be "the interpretation of state regulations

10. Md. Rule 7–202, as relevant, provides:
"Method of Securing Review
"(a) By Petition. A person seeking judicial review under this chapter shall file a petition for judicial review in a circuit court authorized to provide review."

promulgated by [the Commission]" the court noted, preliminary to proceeding with its analysis, that "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.... When the construction of an administrative regulation rather than a statute is at issue, deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965). *See also Maryland Transp. Authority v. King*, 369 Md. 274, 288, 799 A.2d 1246, 1254 (2002); *Maryland Comm'n on Human Relations v. Bethlehem Steel*, 295 Md. 586, 593, 457 A.2d 1146, 1150 (1983). Then, finding the language of Policy 6.0 to be "ambiguous as to the manner in which the Commission should address applications from 'new' programs in relation to application for 'relocated' programs," the court reviewed the Policy's history and the Commission's intent in promulgating Policy 6.0, concluding:

> "[i]t is clear from examining this history that insofar as cardiac programs were concerned, the Commission intended that 'new' and 'relocated' programs were to be treated the same and would be reviewed in the same manner."

Significant to that conclusion was an exchange between Adventist and the Commission staff, during the thirty-day informal comment period, pursuant to COMAR 10.24.01.08D (2)(b),[11] prior to the adoption of Rule 6.0, concerning its meaning. Adventist sought an interpretation consistent with the one it now advocates. Believing that the Policy, as proposed, could not be so interpreted, it wrote the Commission, urging:

> "The Draft Revision would continue to prohibit merged asset systems from operating a [cardiac surgery] program at more than one of its hospitals. We submit that where it

---

11. COMAR 10.24.01.08D (2)(b) provides:

"(b) An explanation that a person who meets the definition of "interested party" in Regulation .01B(19) of this chapter may become an interested party to the review of this application by submitting written comments on the application within 30 days of its docketing ..."

can be demonstrated that two hospitals in the same region are part of a merged asset system and can put in place credentialing, staff training, and clinical support so that teams can function effectively at either institution, this should not be considered the establishment of a new [cardiac surgery] program. . . . The [State Health Plan] should permit the opportunity to demonstrate effective use of merged asset system resources without this being considered a 'new' program."

Letter from William G. Robertson, President and Chief Executive Officer of Adventist HealthCare, Inc., to the Maryland Health Care Commission 8–9 (Aug. 20, 2003).

The Staff responded, taking much the same position as the Commission takes on this appeal:

"Adventist HealthCare believes that reconfiguration of existing capacity is not, and should not be, defined as the establishment of a 'new' program. According to Adventist HealthCare, reconfiguration of open heart surgery capacity would not have an impact on the ability of other hospitals to apply for [Certificate of Need] approval to meet new identified need, and would not diminish the amount of newly identified need. Staff would point out that if every hospital that is a member of a merged asset system were able to establish an open heart surgery program based on this principle, the number of open heart surgery programs in Maryland would more than double, none of which would be considered 'new' capacity. The argument that reconfiguration of existing program capacity to another hospital within a merged asset system should not be considered a 'new' program would clearly undermine the intent of the policy and the principles of regional planning for highly specialized services."

Analysis of Informal Public Comments and Staff Recommendations, Maryland Health Care Commission 26–27 (Sept. 18, 2003).

Moreover, the Circuit Court observed that there was a lack of "a single instruction" in the applicable regulations or in the

Maryland Code "that a 'relocated' program must be subject to a review process separate from the comparative process established for 'new' programs." Nor was the court willing to take the "inferential leap" from the "the mere fact that Policy 6.0 refers only to 'relocated' programs" to the conclusion "that the whole Chapter 2004 delineates between 'new' and 'relocated' programs, to the extent that it requires separate review process." On the contrary, it found, "a far more reasonable explanation for Policy 6.0's requirement that 'relocated' cardiac programs obtain Certificates of Need was that it was meant to distinguish cardiac programs from the other specialties in the State Health Plan that allow relocation of programs without obtaining a new Certificate of Need."

Adventist filed a petition for a writ of certiorari, which we granted, *Adventist Health v. Health Care,* 389 Md. 398, 885 A.2d 823 (2005). As indicated, we shall affirm, and for the reasons that follow.

### B.

■ It is important clarify what is at issue in this case. The case *sub judice* presents a different issue, as well as different circumstances, than our recent decisions in *Medstar Health v. Maryland Health Care Comm'n,* 376 Md. 1, 827 A.2d 83 (2003) ("*Medstar I* "), and *Medstar Health v. Maryland Health Care Comm'n,* 391 Md. 427, 893 A.2d 1099 (2006) ("*Medstar II* "). In both of those cases, the Commission was charged with exceeding its power under its enabling statute by the promulgation of invalid regulations. Nothing concerning the meaning of the regulation at issue was presented; each of the regulations was quite clear, in fact. Despite the contrasting results, both cases involved the Commission's quasi-legislative role, in which the interpretation of a regulation played no part.[12]

---

12. To be sure, the interpretation of an agency's regulations can be important in a quasi-legislative context. It is true that ordinarily, "Th[e] power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of

Here, the critical issue is whether Adventist is entitled to a CON for the relocation of a portion of its existing cardiac surgery program from one hospital in the merged system to

the agency. In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries."
*Weiner v. Maryland Ins. Admin.*, 337 Md. 181, 190, 652 A.2d 125 (1995) *quoting Department of Natural Resources v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 224, 334 A.2d 514, 523 (1975); *Judy v. Schaefer*, 331 Md. 239, 265–66, 627 A.2d 1039, 1053 (1993) (recognizing that the scope of judicial review is more limited when the agency action is quasi-legislative, not quasi-judicial); *Storch v. Zoning Bd. of Howard Co.*, 267 Md. 476, 487, 298 A.2d 8, 14 (1972). In *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 654 A.2d 449 (1995), for example, respondent sought to delay the implementation of a regulation prohibiting smoking in an enclosed workplace. We rejected the respondent's argument that promulgation of the regulation was an abuse of discretion by the Division of Labor and Industries, holding that the agency's quasi-legislative decision was entitled to deference and in substantial compliance with its enabling mandate. 337 Md. at 454, 654 A.2d at 456. Furthermore, we pointed out, deference is especially appropriate to be given to "agencies working in the area of health and safety, which rely extensively on their specialized knowledge of that area in promulgating regulations." *Fogle*, 337 Md. at 455, 654 A.2d at 456 (*citing Givner v. Commissioner of Health of Baltimore City*, 207 Md. 184, 191, 113 A.2d 899, 902 (1955)). *See also Medstar I*, 376 Md. at 21, 827 A.2d at 96; *Medstar II*, 391 Md. 427, 441, 893 A.2d 1099, 1107,. Nevertheless, in this context, an inward look by the agency at the original intent of the regulation in determining its validity may be appropriate. For example, *see Givner, supra*, 207 Md. 184, 113 A.2d 899.

There, plaintiff challenged, as discriminatory, and therefore, invalid, a regulation promulgated by the Commissioner of Health which required separate bathing facilities for each dwelling unit, with exception of two-family dwellings, "any two-story dwelling which contains not more than two dwelling units, provided there is at least one such facility available for the occupants of such dwelling." *Id.* at 187–88, 113 A.2d at 900–01. In upholding the exception, we concluded, in view of the agency's explanation, that most two-family dwellings were occupied by family groups which would presumably exercise greater care in regard to cleaning of facilities and to exercising health precautions, that the classification was a rational one. 207 Md. at 192–193, 113 A.2d at 903. We reasoned: "It is not the function of the courts to pass upon the wisdom of the regulation, or to approve or disapprove it, if it does not exceed constitutional limits," *id.* at 192, 113 A.2d at 903, thus recognizing that administrative agencies are in the best position to interpret the meaning and intent of the regulations they promulgate, and, thus, are entitled to deference regarding their interpretation.

another. Resolution of that question requires the determination of the proper procedure to be used to address the issue. That involves an interpretation of regulations relevant to the issue. Those regulations, as we have seen, were promulgated by the Commission, which now must interpret them. Thus, we are faced, specifically, with a situation involving an administrative agency interpreting its own regulations in the context of its quasi-judicial role.

Administrative agencies possess an "expertise" and, thus, have a greater ability to evaluate and determine the matters and issues that regularly arise, or can be expected to be presented, in the field in which they operate or in connection with the statute that they administer. In *Board of Phys. Quality Assur.*, we stated:

> "[A] 'court's task in review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency.' ... [T]he expertise of the agency in its own field should be respected."

354 Md. at 68–69, 729 A.2d at 381 (citations omitted). Consequently, the interpretation of a statute by the agency charged with administering the statute is entitled to great weight. *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989). *See, e.g., Board of Phys. Quality Assur.,* 354 Md. at 68–69, 729 A.2d at 381; *Sinai Hosp. v. Dep't of Employment,* 309 Md. 28, 46, 522 A.2d 382 (1987); *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307 (1986); *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 759, 501 A.2d 48 (1985).

Moreover,

> "th[e] authority delegated to executive branch agencies may include a broad power to promulgate legislative-type rules or regulations in order to implement the statute. Such rules or regulations will often, of necessity, embody significant discretionary policy determinations."

*Christ v. Department of Natural Resources,* 335 Md. 427, 445, 644 A.2d 34, 42 (1994). This Court has stated that, in the exercise of that authority, "[a] great deal of deference is owed

an administrative agency's interpretation of its own regulation." *Maryland Transp. Authority v. King*, 369 Md. at 288, 799 A.2d at 1254 (2002). Furthermore:

"[A]gency rules are designed to serve specific needs of the agency, are promulgated by the agency, and are utilized on a day-to-day basis by the agency. A question concerning the interpretation of an agency's rule is as central to its operation as an interpretation of the agency's governing statute. Because an agency is best able to discern its intent in promulgating a regulation, the agency's expertise is more pertinent to the interpretation of an agency's statute than to the interpretation of its governing statute."

*Maryland Comm'n on Human Relations v. Bethlehem Steel Corp.*, 295 Md. at 593, 457 A.2d at 1150 (1983). *See also Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463, 477 n. 6, 823 A.2d 626, 634 n. 6 (2003) ("[A]n agency is best able to discern its intent in promulgating a regulation. Thus, an agency's interpretation of the meaning and intent of its own regulation is entitled to deference [citations omitted]"); *Maryland Transp. Authority v. King*, 369 Md. 274, 288–289, 799 A.2d 1246, 1254 (2002) ("[A]n agency's interpretation of an administrative regulation is 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation' [citations omitted]").

 Judicial review of the decision of an administrative agency rendered in a quasi-judicial proceeding is quite narrow, *Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.*, 369 Md. 439, 449–52, 800 A.2d 768, 774–75 (2002); *Gigeous v. ECI*, 363 Md. 481, 495–97, 769 A.2d 912, 921–22 (2001); *United Parcel Service, Inc. v. People's Counsel for Baltimore County*, 336 Md. 569, 576–77,650 A.2d 226, 230 (1994); *Liberty Nursing Center, Inc. v. Department of Health and Mental Hygiene*, 330 Md. 433, 442, 624 A.2d 941, 945 (1993) ("Judicial review of agency fact finding is narrow in scope and requires the exercise of a restrained and disciplined judicial judgment."); *Supervisor v. Asbury Methodist Home*, 313 Md. 614, 626, 547 A.2d 190, 195 (1988), consisting of determining whether the administrative agency made an error of law, *i.e.* the legality of

the decision, and whether the record as a whole contains substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978); *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961) to support the administrative decision. *Baltimore Lutheran High Sch. v. Employment Sec. Admin.,* 302 Md. 649, 662, 490 A.2d 701, 708 (1985).

■ The legality of the proceedings may depend, as it must in the case *sub judice* if the petitioner is to prevail, on the meaning of the enabling legislation or the regulations promulgated pursuant thereto, as pertains here, Policy 6.0. Adventist argues that the Commission's decision to reject its application for a relocation CON was error, but only because the Commission's interpretation of Policy 6.0 as requiring its application to be considered in the CON process, with comparative review, for new programs was incorrect. Thus, in this sense, Adventist challenges the legality of the Commission's decision. Although the construction of statutes and regulations is a legal matter, not factual, this Court has made clear that, because "the expertise of the agency in its own field should be respected," *Board of Phys. Quality Assur.,* 354 Md. at 69, 729 A.2d at 381, that "[e]ven with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency." *Id.* at 68, 729 A.2d at 381. As we have seen, that deference, which we characterized as "considerable weight," *id.,* is due the agency's interpretation and application of the statute it administers and to the agency's interpretation of its own regulations. *King,* 369 Md. at 288, 799 A.2d at 1254. Deference to the interpretation of the agency, however, does not mean acquiescence or abdication of our construction responsibility. Despite the deference, "it is always within our prerogative to determine whether an agency's conclusions of law are correct." *Kushell v. Department of Natural Resources,* 385 Md. 563, 576, 870 A.2d 186, 193 (2005).

## C.

Because this case involves the interpretation of COMAR 10.24.17.04F, and Policy 6.0 contained within, and does not involve a challenge to the legality of the promulgated regulation itself, nor, except for the interpretation issue, a challenge to the Commission's decision to reject Adventist's proposal, the primary question is which party is correct: the Commission or appellant? Typically, a Maryland hospital that wishes to create a new cardiac surgery program must apply for and be granted a CON from the Commission. Md.Code Ann., Health Gen. § 19–120(j)(2)(iii)(2). The Commission uses the CON approval process to address and regulate the medical needs of the State of Maryland. Because CON reviews apply to all cardiac surgery services, this court defers to the Commission with regard to these programs. because of their specialized nature. These services treat "[t]he most complex health problems" in "segments of the population that are most severely ill and at the highest risk for poor outcomes," and are "highly-specialized regional acute care programs requiring the use of technologically-advanced skills or equipment, or both." COMAR 10.24.17.02D.

Adventist claims that, giving Policy 6.0 its plain meaning, the Commission wrongly treated the Adventist LOI as a request to open a new program, rather than, consistent with the policy, as a more limited request for a relocation CON. That, it asserts, "violat[ed] two cardinal rules of statutory interpretation at the same time": the Commission's interpretation ignores the plain meaning of the words of the regulation, which allows a "merged asset system" with an "existing program" to file a CON to "relocate any part of its existing cardiac surgery capacity to another hospital within its system" and inserts terms into Policy 6.0 that are not there, adding the phrase "for a new program" on the end of Policy 6.0, such that it would read, "a merged hospital system may not relocate any part of its existing cardiac surgery capacity to another hospital within its system without obtaining a Certificate of Need *for a new program.*" It relies heavily on our recent holding in

*Kushell,* especially what we said with regards to the plain meaning of statutes:

> "[O]rdinary, popular understanding of the English Language dictates interpretation of its terminology. In construing the plain language, a court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretation that limit or extend its application."

385 Md. at 576–577, 870 A.2d at 193 (internal citations omitted).

In *Kushell,* this Court was asked to decide "whether Maryland tax liability under § 8–716(c)(1)(iv) of the State Boat Act for 'the possession within the State of a vessel purchased outside the State to be used principally in the State,' requires that the out-of-state purchase have been made with the intent to use the vessel principally in Maryland." 385 Md. at 566, 870 A.2d at 187. Md.Code (1973, 2000 Repl.Vol., 2001 Cum. Supp.) § 8–716(c) of the State Boat Act, §§ 8–701 et seq. of the Natural Resources Article imposed Maryland's boat excise tax. Section 8–716(c)(1)(iv) provided:

> "(1) Except as provided in § 8–715(d) of this subtitle and in subsections (e) and (f) of this section, and in addition to the fees prescribed in subsection (b) of this section, an excise tax is levied at the rate of 5% of the fair market value of the vessel on:

> \* \* \* \* \* \*

> "(iv) The possession within the State of a vessel purchased outside the State to be used principally in the State."

Although Kushell had purchased his boat outside Maryland, without any intent of using it principally in Maryland, and, in fact, did not so use it, and relied on, and abided by, the Department's representations with regard to what constituted "used principally in Maryland," 385 Md. at 567, 870 A.2d at 187, he was assessed excise taxes for the calendar year 2001. 385 Md. at 569, 870 A.2d at 189. Following an unsuccessful

appeal of the assessment, the result of which was affirmed on judicial review, and Kushell's appeal to the Court of Special Appeals, we granted certiorari. *Kushell v. Department of Natural Resources,* 383 Md. 569, 861 A.2d 60 (2004). Both the Administrative Law Judge and the Circuit Court, construing § 8–716(c)(1)(iv), held that it did not have an intent element, that the imposition of the tax did not depend on the purchaser's intention to use the boat principally in Maryland. 385 Md. at 569, 870 A.2d at 189. In this Court, Kushell argued, *inter alia,* relying on the plain and, he maintained, unambiguous, language of § 8–716(c)(1)(iv), that the tax is imposed only on the possession of a vessel which, at the time of sale, was purchased with the specific intent of using it principally in Maryland. *Id.* at 570, 870 A.2d at 190. To hold otherwise, he asserted, would render the phrase, "to be," nugatory. *Id.* The Department Natural Resources contended otherwise, however. While maintaining that the interpretation given the statute by the Administrative Law judge and the Circuit Court, which it adopted and advocated, 385 Md. at 570, 870 A.2d at 189, was correct, it urged that the result was also dictated because its interpretation was entitled to judicial deference. 385 Md. at 573, 870 A.2d at 191.

We held in favor of Kushell. 385 Md. at 581, 870 A.2d at 196. Recognizing that the issue was one of statutory construction, as to which our review is *de novo,* 385 Md. at 576, 870 A.2d at 193, and notwithstanding the deference due the interpretation of the administrative agency, after reviewing the applicable canons of construction,[13] we concluded: "[u]nder

---

13. We stated:

"The legal issue in this case is one of statutory interpretation. The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. *See Collins v. State,* 383 Md. 684, 688, 861 A.2d 727, 730 (2004). Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology. *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484, 487 (2004).

"In construing the plain language, '[a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the

ordinary rules of English grammar, ... the plain text supports Kushell's reading." *Id.* at 577, 870 A.2d at 194.

Thus, while Adventist is correct in its reliance on the legal principles articulated in *Kushell,* application of those principles, however, do not assist Adventist's position.

In *Kushell,* the statute was so plain, and clear, that the Department's expertise in the matter could not, and did not, make a difference. Deference to the Department's expertise simply could not carry the day; no matter how much expertise the Department of Natural Resources had, it could not trump the statute itself. The plain meaning of the statute, lacking any ambiguities, dictated the result. Although the deference to which the Department's interpretation was entitled could not, and did not, cause the Department's position to prevail, the proposition for which it advocated, that deference should be afforded to its decisions, was by no means rejected or undermined.

---

statute with forced or subtle interpretations that limit or extend its application.' *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003); *County Council v. Dutcher,* 365 Md. 399, 416–417, 780 A.2d 1137, 1147 (2001). Statutory text 'should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory.' " *Collins,* 383 Md. at 691, 861 A.2d at 732 (*quoting James v. Butler,* 378 Md. 683, 696, 838 A.2d 1180, 1187 (2003)). The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect. *Deville,* 383 Md. at 223, 858 A.2d at 487; *Navarro-Monzo v. Washington Adventist,* 380 Md. 195, 204, 844 A.2d 406, 411 (2004).
"If statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. *Collins,* 383 Md. at 688–89, 861 A.2d at 730. 'If there is no ambiguity in that language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends; we do not need to resort to the various, and sometimes inconsistent, external rules of construction, for "the Legislature is presumed to have meant what it said and said what it meant." ' " *Arundel Corp. v. Marie,* 383 Md. 489, 502, 860 A.2d 886, 894 (2004) (*quoting Witte v. Azarian,* 369 Md. 518, 525, 801 A.2d 160, 165 (2002)).
*Kushell v. Department Of Natural Resources,* 385 Md. 563, 576–577, 870 A.2d 186, 193–194 (2005).

The case *sub judice* is an entirely different circumstance. The language of Policy 6.0 and COMAR 10.24.17.04F is, at best, as articulated by the Circuit Court, "ambiguous." This is not a case where the regulation in question has "no ambiguity" such that "we do not need to resort to the various, and sometimes inconsistent, external rules of construction . . ." 385 Md. at 577, 870 A.2d at 193–194. Instead, giving deference to the Department's interpretation of its regulation in the case *sub judice* may be appropriate to resolve ambiguity, as long as there is a substantial basis, when all is said and done, for that interpretation.

Adventist argues that by interpreting Policy 6.0 the way it does, the Commission ignores the 2004 SHP's general distinctions between "new" and "existing" programs, citing to a number of sections of the 2004 SHP which explicitly govern each type of program separately. For example, it refers to the following sections involving "new" programs:

"Policy 1.3 A Certificate of Need issued by the Commission for the establishment of a *new* cardiac surgery program will require as a condition of issuance that the program achieve minimum volume standards within 24–months of beginning operation and maintain the minimum utilization level in subsequent years of operation."

".05B Commission Program Policies; Consideration of *New* Program

"The Commission will consider a *new* program in a Regional Service Area under the following circumstances . . ."

".05C(2) Approval Policies

"Approval of a *New* Program.—The Commission will approve the establishment of a *new* program . . ."

By contrast, Adventist cites a number of sections that refer to "existing" programs; for example:

".03B(3) If an *existing* program does not meet the required minimum volumes . . ."

".04(B) These *existing* programs focus primarily on quality improvement relative to CABG surgery . . ."

"Policy 9.1 The Commission will determine whether *existing* programs in a Regional Service Area have demonstrated compliance with the Commission's public reporting requirements."

Based on these examples, Adventist argues that, implicitly, at least, the Commission intended for these "new" programs and "existing" programs to be treated differently. It concludes: "Policy 6.0, cannot, as a matter of law, possibly mean that applications to partially relocate 'existing' programs are no different than applications that seek to open a 'new' program because that result is inconsistent 'grammatically and in relationship to other statutory provisions.' *Kushell*, 385 Md. at 581[, 870 A.2d at 196.]" [14]

The Commission rejects all of Adventist's claims, offering instead, its own interpretation of Policy 6.0. It notes first that during the formulation of the 2004 SHP, in its "Analysis of

---

**14.** Three other arguments made by appellant also fall short. Adventist claims that by treating Policy 6.0 as applicable to new programs, the Commission renders it superfluous and thus violates another statutory tenet, that one section of a statute cannot render meaningless another section of the same statute. It does not follow, however, that, the mere fact that the 2004 SHP refers in some sections to "existing" programs and in others, to "new" programs means that Policy 6.0 requires a separate and distinct CON process for "existing" programs.

Adventist also argues that considering the Adventist LOI outside of comparative review would not violate the principles of regional planning as the Commission claimed. The Commission determined, however, that the impact of a partially relocated program to an area previously lacking a cardiac surgery program could be substantial, and thus, must be evaluated using the same principles as are applicable in the evaluation of new programs.

Finally, Adventist denies that it "should have known" that, in view of the Commission Staff's addressing of the issue when the 2004 SHP was being considered, its LOI to partially relocate would be treated as a request for a new program. It argues, rather, that the Staff comments did not, in fact, indicate an intent on the part of the Commission to treat relocated programs and new programs the same. Indeed, it points out that at no time did the Commission Staff indicate "that a CON seeking partial relocation [would be] synonymous with a CON seeking a new program ..." Whether Adventist anticipated, or should have, the Commission's interpretation of Policy 6.0, does not answer the question we must decide—whether that interpretation, whenever arrived at, is correct.

Informal Public Comments and Staff Recommendations," it stated:

> "Staff would point out that if every hospital that is a member of a merged asset system were able to establish an open heart surgery program based on this principle, the number of ... programs in Maryland would more than double.... [Adventist's] argument that reconfiguration of existing program capacity ... should not be considered a 'new' program would clearly undermine the intent of the policy and the principles of regional planning for highly specialized services.... Given the limited number of programs offering cardiac surgery, it seems appropriate that changes in the location of those programs be the subject of a full Certificate of Need review. Staff believes that the Commission should maintain the policy that a merged asset hospital system may not relocate any part of an existing cardiac surgery program to another hospital within its system without obtaining a Certificate of Need."

It is the Commission's general position that CONs for relocation are no different than CONs for new programs. They have been addressed separately in the SHP simply to specify the situations in which the Commission exercises its control. It further notes that the Cardiac Surgery Chapter of the SHP had always prevented merged asset systems from operating cardiac surgery services at more than one of its hospitals, even prior to the 2004 revision, a fact that Adventist was aware of and acknowledged.[15] This, it contends, resolves any questions surrounding the statutory intent of Policy 6.0.

Furthermore, the Commission maintains that fairness and efficiency dictated its decision to submit the Adventist proposal to comparative review. As with a CON for a new program, the Commission was merely undergoing the same process in

---

15. In a letter commenting on the Cardiac Surgery Chapter and Policy 6.0, Adventist's CEO William G. Robertson wrote that "the Draft Revision [to the State Health Plan] would continue to prohibit merged asset systems from operating a [cardiac surgery] program at more than one of its hospitals ..."

order to fully ascertain the effect of a relocated program on surrounding hospitals. "Adventist is not entitled to override the Commission's choices about the effective administration of its CON program," the Commission asserts, reminding this Court that "[t]he Court of Appeals will 'review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity." (*Quoting Carriage Hill–Cabin John, Inc. v. Maryland Health Res. Planning Comm'n*, 125 Md.App. 183, 212, 724 A.2d 745, 760 (1999)).

In approaching this question, we repeat the well-settled precedent: an administrative agency's interpretation and application of the statute it administers, *Board of Phys. Quality Assur.*, 354 Md. at 69, 729 A.2d at 381, and the regulations it promulgates pursuant thereto and in furtherance thereof, *King*, 369 Md. at 289, 799 A.2d at 1254, ordinarily is entitled to "considerable weight by reviewing courts." *Board of Phys. Quality Assur.*, 354 Md. at 69, 729 A.2d at 381 (citations omitted).

█ The Commission submitted the Adventist LOI to comparative review pursuant to Policy 6.0 because it believed that allowing requests for relocation to circumvent the typical CON processes would lead to the unchecked proliferation of cardiac surgery programs in violation of the overarching policy of the 2004 SHP favoring "a system of higher volume programs" as opposed to "a system where all hospitals perform at only the minimum volume." COMAR 10.24.17.04A (3). This issue was specifically addressed during the consideration of the 2004 SHP and prior to its promulgation. This is relevant to the Commission's intent in adopting Policy 6.0. Moreover, despite the use of "new" and "existing" in different sections of the 2004 SHP, there is no explicit indication that the Commission intended programs wishing to be relocated to be treated differently than new programs in regards to the CON application process.

Furthermore, reading Policy 6.0 in context with the other provisions of the SHP, as we are required to do, *Kushell*, 385 Md. at 577, 870 A.2d at 193, we are satisfied that, while the Commission may recognize differences in the treatment of programs that already exist, and programs that wish to exist, in a variety of other administrative areas, these distinctions do not indicate that the process through which an application for the placement of a program in a new area should be analyzed differently depending on the pre-placement status of such that program.

The dire consequences that Adventist suggests will result from affirming the Commission's interpretation, primarily that CONs for relocation will be treated unfairly under a traditional CON review process, rest primarily on the foundational premise that there is a difference between placing a new program in an area previously lacking a cardiac surgery program, and partially relocating a previously existing cardiac surgery program to an area previously lacking a cardiac surgery program. On this point, we defer to the Commission's expertise. It has determined that there is no difference in the resulting impact to surrounding programs whether the program is new or relocated, a policy concern of the Commission's. Both program placements have the potential of affecting surrounding patient volumes. Thus, Adventist's foundational premise is unfirm, and the resulting consequences are similarly ineffectual.

We agree with the Circuit Court's conclusion, and the Commission's position, that, absent a provision that explicitly requires that relocation CONs be submitted to a different process than CONs for new programs or that demonstrate that the Commission intended for the two different types of programs to undergo the same evaluative procedure, we shall defer to the Commission's expertise. Accordingly, there is no basis to reverse the Circuit Court's judgment.

AFFIRMED, WITH COSTS.